I'd like to reserve five minutes for rebuttal if that's possible. Certainly. As this court observed in Garcia, it's no trifling matter for police to storm a residence with guns drawn. Incursions of this nature can have tragic results. Many of those results we've seen lately in the news, lots of bad things that can happen when police burst into a house with no gear to break down the door. And that's exactly what happened in this case. There's no real question. You're breaking in and out a little bit. Maybe you can move closer to the microphone. We'll try that and see if it helps. Is this better, Your Honor? It's a little bit better. I'm sorry. It's odd because I tried to use the same Zoom setup I've used many other times. And I actually checked it out with your court. Clerk, is this working better now? Yes, we can hear you. Thank you. Thank you. So when the police come into a house with gear to break down the door and arrest someone, obviously that's a violation of the Fourth Amendment. And there's lots and lots of case law that says the Fourth Amendment applies to the greatest extent when the police are coming into someone's house. What the government wants this court to find is that as long as a warrant is obtained after the intrusion, that initial intrusion is going to be open. And all the fruits of that intrusion can be found. If that's the case, we really have an exception that's followed the rule because you would never need a cert warrant to enter into a home as the government construes the independent source document. Under the government's theory, as long as the officer says, well, I was going to get a warrant anyways, the entry is okay, the seizure is okay. And that's simply not the law. If that was the law, there would be no cases like Peyton versus the United States. There would be no cases like Lundin in this circle. There would be no cases like Garcia in this circle because something has to be done. In this case, that search led to the seizure of Mr. Saley's cell phone, and that cell phone was the source of the main evidence the government used to show, to attempt to show that Mr. Saley knew what the devices were going to contain. But even so, was the warrant tainted in any way by the unlawful entry? The warrant itself was not tainted by the unlawful entry, Your Honor. But as I was attempting to point out, and obviously I did it ineffectively, is that under the government's theory, they cannot simply justify an illegal entry by getting a warrant afterwards. If this was the case, all of the cases that deal with knock notice, where there's a suppression as a result of a violation of knock notice, where there's an illegal entry to the house,  because if you secure any illegal entry by a subsequent warrant, then there's no reason to ever get a warrant. What you'd be doing is changing the decision as to whether a search can occur from a neutral magistrate interposed between the police and the homeowner, or the apartment renter, to the officer who simply says, yes, I have probable cause, I'm going to go in at gunpoint and seize everything, and then I'll get a warrant later. So you're really removing the neutral magistrate from the equation if you accept that a subsequent warrant will always be an independent source. I'm sorry, counsel, are you asking us to eliminate the independent source doctrine? Is that what you're asking us to do? No, I'm not asking you the independent source doctrine, but there is no independent source in this case, because the warrant was not independent, because the original search is what led to the seizure of the phone, and the seizure of the phone, when that was searched, led to the evidence in this case. The warrant didn't cause the seizure of the phone. The phone had already been seized prior to the warrant. So in this case, there was no independent source. In many cases, you can have an actual independent source where, for example, if the police would go in and secure the premises and get a search warrant, they certainly, as in Segura, can conduct a search later to find new evidence, and that new evidence would be admissible. But in this case, the police seized the phone out of Mr. Saley's hand at the door when they entered that door illegally. So in this case, there is no real independent seizure of the phone. There is only a post hoc attempt to justify the seizure of that phone, and that's a big difference in this case. So if they had seized protectively the whole premises and not taken any item inside while they completed the warrant application and gotten the warrant, that would be okay if they then executed the warrant and found the phone? If they had not seized the phone originally, yes, Your Honor. But they had secured the whole premise. So in that sense, they've sort of seized the premises while they are, protectively while they're completing the warrant application. That would be okay in your view? Yes, Your Honor, because there's a difference between securing a site to make sure nothing is destroyed, to make sure that no one has access. The case is replete with instances where the police are authorized to freeze a location. But there's a difference between freezing a location and seizing individual items at that location. And in this case, what happened was they seized individual items, primarily the phone. But is that distinction meaningful when, you know, the seizure of the asserted seizure of the items occurs within the overall seizure protectively of the premises? It doesn't seem like much of a difference. They didn't like seize the premises and then take the phone to another location, hold it, execute the warrant, and then say, aha, now I've done it. It's just it's still in the same seized premises as whether or not they took individual custody of it as opposed to custody of the whole place. I think that's a significant difference, Your Honor, because if you look historically at what people can do when they're seizing the premises, for example, there's an old Supreme Court case, United States v. Hicks, which isn't mentioned in the briefs. But in that case, the officers went in and they moved a stereo to look at the serial number on the stereo. And Justice Scalia said that moving the stereo was a violation of the Fourth Amendment because it was not in plain view. Just moving something changed the character of the search. And in this case, there's a big difference between freezing the premises, which they could have done without even going up the stairs, because as you can tell from the picture of the photo in the government's, I'm sorry, the picture of the residence in the government's briefs, there's just a stairway that goes up. They had it surrounded. There were many federal officers there. There were Richmond police there. There was no need to even go up the stairs. So they could have frozen the residence while they were waiting for a warrant, but that's not what they chose to do. But they didn't search the phone until after they got the warrant, right? But they seized the phone prior to the warrant. But how is that any different than freezing the entire apartment? Because the phone is a discrete portion of the apartment, and they grabbed it and moved it. And I'm not sure the record is clear as to the timing of the search of the phone. The record on that is not developed. I would assume that the phone was looked at prior to the warrant, because when Officer Anderson discusses what happened, he says that he looks at the phone and noticed that it had been logged into Facebook. Then later when he tried to search it, some of those Facebook things were deleted. So it's clear to me, I believe, I think from the not very specific record on this point, that the officers looked at the phone at the time they originally seized it. But there's no indication one way or the other based on the record? The record is unclear on that point, Your Honor, because Judge Breyer simply said the independent source cured everything. There was no evidentiary hearing, so it's ambiguous on that. We provided a series of photographs with metadata that showed the searching took place prior to the execution of the search warrant, and that same metadata is ambiguous as to when the phone was actually searched. And just briefly, Your Honor, I would like to address the sufficiency element, because I think that that's important, and the court really understands how the same argument supports our argument that the evidence could not have been admitted, and it is not sufficient. And I think that the government keeps going off on the position that the text messages from Mr. Saley are admissions by Mr. Saley, and those text messages by Mr. Saley are incriminating. However, if the court actually looks at the contents of those text messages, they're innocuous by themselves. They're only incriminating if they're read in context with the other accompanying alleged co-conspirator statements. For example, if the court will look at page 9 and 10 of the government's brief, there's a listing of all of these text messages. And on the right side of the listings of Mr. Saley's text messages, it says, Nope, they don't even knock. I'll set the alarm clock for 1030, then I'll leave the door open. Okay, you ever find your car? LMAO. That's Hallamale. Did it say delivered? So there's nothing inherently incriminating in this text message by Mr. Saley. And with that, I'd reserve the rest of my time. That's a tough argument when you're on the standard review where every inference is now drawn in favor of the government. But you're down to less than four minutes. I understand. I'd like to reserve the balance of my time. Thank you. Thank you. Good morning. My name is Kelly Volkar, and I'm here on behalf of the United States. This court should affirm Saley's convictions for three main reasons. First, the district court correctly found in this case that this case falls squarely within the independent source doctrine because the search warrant was almost entirely written before the agents entered the premises and the magistrate issued the warrant based on untainted information. Second, overwhelming evidence of Saley's convictions and established that he was in a conspiracy with MN. And third, the district court did not abuse its discretion in the other evidentiary rulings for the reasons stated in our brief. However, on the arguments that my opposing counsel made today. I'm having the same issue with you that we had earlier with counsel where you're kind of breaking in and out a little bit. So if you could move a little closer to the microphone, please. Judge Collins? I was wondering how you addressed the Lundin case with respect to its rejection of the independent source doctrine. Yes, Your Honor. So I think that one thing, I think that the Lundin case as well as the concern my opposing counsel made of police intruding into people's premises without any stop is directly addressed by the independent source doctrine itself, which requires two main requirements that this court has held. One, that the government would have sought the warrant regardless of anything they saw on the untainted premises or the illegal search. I would argue that that was not the case in Lundin. There were no facts before this court that the government was intending to search a warrant before they showed up at the defendant's, in Lundin's case, premises at 4 a.m. and knocked on the door. This case is very different for that reason. The second requirement is what Judge Nguyen pointed out, which is that there must be untainted information before the magistrate when he or she is making the decision to issue the search warrant. And so I want to circle back to that first point because I think that's really critical here and distinguishes a lot of the cases that my opposing counsel has relied upon. Here, Special Agent Anderson said in his declaration, and that's at the record ER 523 to 527, he said in his declaration that he had most of his affidavit for a warrant prepared, and he was waiting to insert one paragraph about what occurred during the controlled delivery itself. Then, in fact, when the controlled delivery occurred, he did finish that paragraph, and within an hour, he called the magistrate to obtain the warrant that he ultimately, that the agents relied upon to search the premises and to later search the cell phone. This makes this case very different from Garcia or Lundin, where the agents or the officers had not done any steps. In fact, in Lundin, his court says the officers had not even attempted to get a warrant, and that raises the policy concerns my opposing counsel is concerned about, which is that if the police don't even have to attempt to get a warrant, then they can break down doors, as my opposing counsel says. But that is not what the independent source doctrine requires. Independent source doctrine requires that the police and the agents have made an attempt, and the district court has to find, and here the district court did find, that the agents have made an attempt to get a search warrant and would have pursued the search warrant regardless of anything they saw inside the building. So I would say that that is the critical distinction here. And then there's, of course, the second requirement that the magistrate issue the search warrant based on untainted information. Does the independent source doctrine here apply equally to the different violations? Because there's the violation of entering the premises and arresting them and the curtilage, but then there's the further fact that they then search and seize items within the property. Are those differently situated with respect to the independent source doctrine? Your Honor, I would say no based on the Murray case. So first in the Sakura case, the Supreme Court specifically focused just on evidence that was found after the illegal search. My opposing counsel is correct in that. But the Murray case builds on Sakura and says, we are now going to answer the question we left open, which is can the government get to the evidence that was seen in plain view during that initial illegal entry? And the Murray court said yes. And the reason why the Murray court said yes is because the government should not be put in a worse position. And the Murray court says, as far as the policy, that if the police are going to go that route, essentially the situation we have here, they have a heightened burden. They have to prove to a district court that nothing was tainted in that information. And essentially they have now added to their burden in order to get to that evidence. And the Murray case says that at 539-40 and also 542. And one further thing I wanted to add to rebut my opposing counsel's statement, the record is clear that the cell phone was searched after the search warrant. Specifically, special agent Anderson states in his declaration at ER 527 paragraph 12, that he searched the cell phone after the search warrant was obtained. But did the court make a specific finding on that? I mean, counsel said that there was some circumstantial evidence to cast doubt on the veracity of that. Was there a finding by Judge Breyer on that point specifically? Your Honor, because the agent did not testify before, Judge Breyer did not make a finding on that point specifically. Counsel have discussed it actually as recently as this fall. And part of the reason why the agent knows the search of the cell phone occurred later is the photos all have his work desk in the background and the timestamps are all starting at 5 p.m. and then later. So there is evidence, but to my opposing counsel's point, in the record, the only thing that exists is the agent's declaration. And Judge Breyer did not make a specific finding on that point. But there is nothing to rebut the agent's declaration in the record. So with that, I would like to turn to the sufficiency and the co-conspirator statements. So first, starting with the sufficiency of the evidence, as Your Honor pointed out, the standard of review at this point in time requires viewing the evidence in the light most favorable to the government. And with that, I would argue, as we did in our brief, that there is sufficient evidence to support the convictions here. First and foremost, the parties stipulated at trial that almost 3,000 pills of ecstasy were sent in packages from a, quote-unquote, lawyer's office in Germany, containing, quote-unquote, documents, and they were addressed to Salih's alias. Salih received those packages, said that he was expecting them, said he was the person they were addressed to, signed for them, took them inside, and put the two packages in his bedroom. In addition, Salih had received two other international packages within just the prior month. The testimony at trial indicated the pills were worth $30,000. You're fading. You're fading out. We couldn't hear you. My apologies, Your Honor. The pills were worth $30,000 to $75,000. MN and Salih were closely monitoring and tracking the progress of these packages. In fact, the text messages show that within minutes of when MN tells Salih information about the packages, someone is tracking using the unique tracking code of these packages containing almost 3,000 pills, up to $75,000 worth of drugs. Someone is checking on them at the same time that MN is telling Salih, oh, they're still in Oakland, so Monday then, make sure that you're ready, we're paying you. They are also talking in the same text messages about buying vehicles, buying a boat, buying a car, putting gold rims on them. And what really ties mostly to Salih, specifically is near days before these text messages, near days before they're going to receive almost 3,000 pills, Salih is messaging with a potential customer to sell 100 pills for more than $1,000. Say Chow, that customer, asked for 10 pills, and 10 pills were in the packages on their way to Salih. In Salih's room, there was his wallet and fishing equipment, mere feet from where the packages were discovered. So we would argue that in the light most favorable to the prosecution, a rational juror could find that Salih committed both counts beyond a reasonable doubt, and we would also argue that those same facts support the district court's holding that a conspiracy existed, that Salih had knowledge of it, and that therefore the district court did not abuse its discretion in admitting the co-conspirator statements. With that, unless the panel has further questions for me, if the panel has no further questions, then the United States respectfully requests the court affirm on all counts for the reasons stated here today and in our briefs. Thank you. Any other questions? We have no further questions. Thank you. I think you must be on mute, Mr. Cannon. We can't hear you. Can you hear me now, Your Honor? Yes. Thank you. Thank you. I'd just like to address the statements made regarding the timing of the search of the phone. As I indicated, Officer Anderson said that he looked at the phone, he saw that it was logged into Facebook. He then put the phone into some type of bag, and then he later searched the phone. When he later searched the phone, the login to Facebook information that he saw earlier was not on the phone, and he claimed that that information was somehow deleted by Saley. So I think circumstantially that indicates that the search of the phone occurred prior to the search warrant, but as I indicated, the record is not completely clear. Are you saying that he went to the Facebook account or that he looked at a phone where a login appeared, some sort of notification appeared? His declaration indicates that he looked at the phone. He saw that it was logged into Facebook. He saw some Facebook text messages. There's a picture of those Facebook text messages. Then, however, when he went to search the phone after the warrant had been obtained, those Facebook text messages were no longer on the phone. So you're saying in his declaration he did not indicate that he actually manipulated the phone to get to those Facebook messages? They just appeared? They were there when he picked up the phone, he looks at it, and there's Facebook messages there? That's close to what his declaration says. I was trying to pull the declaration so I could look at it exactly, but when I pulled the computer closer to me, it's sitting on my notebook, and I didn't want to give everybody vertigo by moving things around. But I think in his declaration, which I think is 586 or something like that in the excerpt of record, that citation is not accurate, but it's in the 500s. When the government was talking about sufficiency, one of the things that she was talking about was that Mr. Saley was texting to someone about a small sale, and that's an instance that we think should not have come in because it's not related to this. And at trial, as we argued in our brief, the government specifically said it was not arguing that the earlier communications between Mr. Saley and the person in Sacramento were part of the conspiracy that was charged here. So at trial, the government clearly on the record said they're not contending that those communications were part of the conspiracy alleged. Now, probably because the level of evidence is so thin and is so weak, the government is now trying to bootstrap a finding of conspiracy by pointing to evidence of alleged other bad acts, which at trial they specifically said was not part of the conspiracy charge. So I think the government's really kind of desperate attempts to show that there was sufficient evidence of what Mr. Saley knew is overstating the record because that's something where they specifically said was not part of the conspiracy. Thank you very much. I see that I'm out of time. Thank you very much, counsel, for both sides for your argument today. The matter is submitted.
judges: Nguyen, Burgess, Collins